**ORIGINAL**

FILED

Eric Havian (CA Bar No. 102295)
    Email: eric@whistleblower.law
WHISTLEBLOWER PARTNERS LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 707-6861

Reece Roman (CA Bar No. 256855)
    Email: reece@reeceromanlaw.com
REECE ROMAN LAW, PC
5857 Owens Avenue, #300
Carlsbad, CA 92008
Tel: (760) 445-2465

2024 NOV 19 PM 3: 12

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY: ___PD___

PAID

NOV 1 9 2024

CLERK, U.S. DISTRICT COURT
COURT 4612

*Attorneys for Qui Tam Plaintiff-Relator*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

[UNDER SEAL]

    Plaintiffs,

    vs.

[UNDER SEAL],

    Defendant.

Case Number: 2:24-CV-10001-DDP(ASx)

**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

**DEMAND FOR JURY TRIAL**

**DO NOT ENTER ON PACER**
**DO NOT PLACE IN PRESS BOX**

Eric Havian (CA Bar No. 102295)
    Email: eric@whistleblower.law
WHISTLEBLOWER PARTNERS LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Tel: (415) 707-6861

Reece Roman (CA Bar No. 256855)
    Email: reece@reeceromanlaw.com
REECE ROMAN LAW, PC
5857 Owens Avenue, #300
Carlsbad, CA 92008
Tel: (760) 445-2465

*Attorneys for Qui Tam Plaintiff-Relator*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* PATRICK COLLINS, <br><br> Plaintiffs, <br><br> vs. <br><br> INSPIRE MEDICAL SYSTEMS, INC., <br><br> Defendant. | Case Number: <br><br> **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> **COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT** <br><br> **DEMAND FOR JURY TRIAL** <br><br> **DO NOT ENTER ON PACER** <br> **DO NOT PLACE IN PRESS BOX** |

2

## INTRODUCTION

1.    Relator Patrick Collins brings this case on behalf of the United States alleging that Defendant Inspire Medical Systems, a company specializing in medical devices used to treat sleep apnea, has defrauded the United States, specifically the Medicare program. The fraud stemmed from the company encouraging and promoting unqualified physicians to implant its devices, in violation of Medicare's rules.

2.    Inspire is the sole producer of an implantable medical device, called a hypoglossal nerve stimulation device, that's used to treat certain types of sleep apnea. For Medicare to pay for the device, and the associated surgery to implant it, a patient must meet certain medical necessity requirements, including lacking a condition known as a complete concentric collapse (CCC) at the soft palate level, which is a blockage in the upper airway that occurs when the soft palate and the sides of the throat collapse, completely blocking the area behind the roof of the mouth. To qualify for Medicare coverage, the lack of CCC must be confirmed via a drug-induced sleep endoscopy (DISE) procedure, which includes the sedation of the patient and the insertion of a camera, or endoscope, to evaluate for CCC.

3.    Because a diagnosis of CCC is sometimes hard to determine, Medicare requires providers who implant Inspire devices to have performed at least 15 DISE

procedures and film them. Those video clips are required to be shared with Inspire, and Inspire employees are to provide a second opinion on the presence of CCC.

4.     If the physician who performed the DISE and the Inspire employees agreed on the presence or absence of CCC in the 15 (or more) video clips at least 80% of the time, that physician is certified to perform implants of Inspire devices. If a physician has not met that condition, Medicare will consider implants inserted by that doctor to be medically unnecessary and will not cover them.

5.     In striving for sales growth, Inspire knowingly flaunted this rule, instead encouraging its employees to credit multiple physicians with the same DISE video clips, resulting in physicians being falsely certified to insert Inspire devices.

6.     If Medicare had been aware that the physicians were falsely certified, it would not have paid for the Inspire devices or the procedures to implant them.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and (b) and 28 U.S.C. §§ 1331, 1345.

8.     Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1391(c) because Defendant transacts business in this district.

## PARTIES

9.     Inspire Medical Systems, Inc. is a Delaware Corporation with primary place of business at 5500 Wayzata Blvd., Suite 1600, Golden Valley, MN 55416.

4

The company is publicly traded (NYSE: INSP) and specializes in medical devices and other technologies to treat sleep apnea.

10. Relator Patrick Collins is a resident of the state of California. He worked at Inspire in a sales and clinical consulting role from November 2022 to July 2024. His title was Territory Manager. Relator has been in the medical device sales industry since 2001.

<strong>RELEVANT BACKGROUND</strong>

## I.  The False Claim Acts

11. The Federal False Claims Act (FCA) was originally enacted during the Civil War. Congress substantially amended the FCA in 1986—and again in 2009 and 2010—to enhance the ability of the federal government to recover losses sustained as a result of fraud committed against it. Congress amended the FCA after finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as the primary tool for combating this fraud, required modernization. Congress intended the amendments to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisal or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

12. In relevant part, the FCA prohibits: (a) knowingly presenting, or causing to be presented, a false or fraudulent claim to the federal government for payment or approval; (b) knowingly making or using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government; and (d) conspiring to violate these provisions. 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

13. "Knowingly" means that a person, with respect to information, "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A).

14. A record or statement is "material" if it "ha[s] a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

15. The FCA allows any person with information about a FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires the Complaint to be filed under seal for a minimum of 60 days

6

(without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

16. Pursuant to the foregoing laws, Relator seeks to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that Defendant made or caused to be made to the Government, and for Defendant's failure to repay overpayments owed to the Government, arising from Defendant's fraudulent conduct.

## II. The Medicare Program

17. Medicare is a federally funded health insurance program administered by the Center for Medicare and Medicaid Services (CMS), a part of the Department of Health and Human Services, benefiting individuals 65 and older, the disabled, and patients with certain underlying medical conditions. *See* 42 U.S.C. § 1395c *et seq.*

18. Original Medicare consists of Part A and Part B. Part A covers hospital services and skilled nursing facility care, among other things. Part B is medical insurance that covers expenses like doctor appointments, outpatient care and procedures, and certain drugs. Medicare Part D offers prescription drug coverage. Patients with both Medicare Part A and Part B may purchase Medicare Supplement Insurance, or Medigap, to cover costs like copayments and coinsurance.

7

19.     Medicare Part C, known as Medicare Advantage, consists of insurance plans administered by private companies that contract with the federal government. Medicare Advantage combines the coverage of Part A and Part B under a single insurance plan, and may also include Part D coverage.

20.     Under Medicare Part C, CMS contracts with private insurance carriers to provide Medicare beneficiaries with coverage for the types of medical services they would otherwise receive under the traditional Medicare program. *See Cares Cmty. Health v. U.S. Dep't of Health & Hum. Servs.*, 944 F.3d 950, 953 (D.C. Cir. 2019); *see generally* 42 U.S.C. §§ 1395w-21 to -28. These private insurers are government contractors and submitting a false claim to a Part C insurer is a violation of the FCA. *See United States ex rel. SW Challenger, LLC v. EviCore Healthcare MSI, LLC*, No. 19 Civ. 2501 (VM), 2021 WL 3620427, at *9 (S.D.N.Y. Aug. 13, 2021). Medicare reimburses healthcare providers, either directly or through a managed care program, for the costs of providing covered health services to Medicare beneficiaries. *See* 42 U.S.C. § 1395x(v)(1)(A).

21.     In addition, each Medicare provider must sign a provider agreement as a condition of participation, and by so doing must agree to comply with all Medicare requirements—including the fraud and abuse provisions. A provider that fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicare patients.

8

## III. Medicare Coverage for Hypoglossal Nerve Stimulation for Obstructive Sleep Apnea

22.    Hypoglossal nerve stimulation (HNS), also known as upper airway stimulation, is a treatment for obstructive sleep apnea that uses an implant to stimulate a nerve under the tongue to prevent the tongue from blocking a patient's airway.

23.    Currently, the only hypoglossal nerve stimulators that are approved by the Food and Drug Administration are Inspire devices called the Inspire II System and the Inspire 3028 System (a smaller version of the Inspire II system).

24.    The devices were given premarket approval in April 2014 and June 2017 respectively.

25.    CMS provides that "no [Medicare] payment may be made . . . for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury . . . ." Title XVIII of the Social Security Act (SSA), Section 1862(a)(1)(A). Medicare Administrative Contractors ("MACs"), which process Part B claims, including HNS, issue Local Coverage Determinations ("LCDs") specifying what the MAC considers medically necessary, consistent with the SSA, in its jurisdiction. Several LCDs cover HNS in detail, each dictate largely consistent coverage requirements across jurisdictions. Each of the LCDs were

9

implemented in 2020. *See e.g.*, L38307, L38393, L38387, L38528, L38385, L38398.[1]

26. Medicare makes it clear through its LCDs that it considers HNS medically reasonable only in certain circumstances. Conditions include patients being over 22 years old, patients having a body mass index under $35kg/m^2$, and most importantly to Relator's allegations, patients having an "absence of complete concentric collapse at the soft palate level as seen on a drug-induced sleep endoscopy (DISE) procedure."

27. A complete concentric collapse (CCC) at the soft palate level is a blockage in the upper airway that occurs when the soft palate and the sides of the throat collapse, completely blocking the area behind the roof of the mouth. As alleged above, a DISE procedure includes the sedation of the patient and the insertion of a camera, or endoscope, to evaluate for a complete concentric collapse at the soft palate level. A DISE procedure generally takes a physician less than 20

---

[1] At times, Medicare Advantage plans have different coverage determinations than the direct government payor. Several Medicare Advantage coverage determinations in function mimic the LCDs. *See e.g.*, Molina Healthcare, *Molina Clinical Policy for Hypoglossal Nerve Stimulation for the Treatment of Obstructive Sleep Apnea (OSA): Policy No. 363* (June 12, 2024), https://www.molinaclinicalpolicy.com/molinaclinicalpolicy/-/media/Molina/PublicWebsite/PDF/Common/Molina-Clinical-Policy/Hypoglossal-Nerve-Stimulation-for-OSA_R.pdf.

minutes to perform (given the involvement of anesthesia, the process is significantly longer from the patient perspective).

28. Because the presence of disqualifying CCC is, at times, hard to assess, CMS requires that providers who seek to perform HNS surgery demonstrate proficiency with the DISE procedures used to assess CCC. The LCDs specifically provide that: "determining if complete concentric collapse (CCC) is present, the inserting provider shall be certified by the FDA approved manufacturer's second opinion service of validation via video clip submissions of at least 80% agreement in at least 15 consecutive studies. Inserting providers shall have documentation to submit to this contractor if necessary." L38307.

29. Thus, to be covered by Medicare, the provider inserting the device must have performed at least 15 DISE studies and reached agreement with a second opinion from an Inspire employee on at least 12 (80%) of them. If this requirement is not met, the LCD states that the surgery will be "considered not reasonable and necessary and therefore will be denied." L38307.

30. When issuing preapproval for the device, the FDA was aware of complexities with the DISE procedure and its panel "agreed that a proper training program was necessary for physicians planning to use this technology and only qualified experts should be allowed to screen patients using the DISE examination." FDA, *Summary of Safety and Effectiveness Data (SSED) for Premarket Approval*

*P130008* (Apr. 30, 2014), https://www.accessdata.fda.gov/cdrh_docs/pdf13/P130008B.pdf, at 37 (approving the Inspire II system).

31. When CMS released the relevant LCDs, several commenters reacted by suggesting that the requirement of 15 procedures was excessive, and 10 would be more appropriate. At least several MACs specifically rejected the suggestion, noting that "[t]here was a consensus among the subject matter experts (SMEs) that the second party review is appropriate and the 15 procedures was a conservative, but good number, allowing for greater success with implantation." *See Response to Comments: Hypoglossal Nerve Stimulation for the Treatment of Obstructive Sleep Apnea (Article A57959)*, CMS (Mar. 15, 2020), https://www.cms.gov/medicare-coverage-database/view/article.aspx?articleId=57959&ver=2; *See also Response to Comments: Hypoglossal Nerve Stimulation for Obstructive Sleep Apnea (Article A58070)*, CMS (May 7, 2020), https://www.cms.gov/medicare-coverage-database/view/article.aspx?articleId=58070&ver=2.

32. Each Inspire device costs between $30,000 and $40,000 and the implantation of either device, billed under CPT 64582, costs roughly $2,000. In 2022, Medicare Part B paid for over 2,000 HNS procedures using Inspire devices.

## FACTUAL ALLEGATIONS

33. Since at least 2022, when Relator began working at Inspire, the company has perpetrated a scheme to defraud payors, notably Medicare, by

12

allowing and encouraging unqualified otolaryngologists (a doctor specializing in the ear, nose, and throat) to implant its devices.

34. The otolaryngologists performing the procedures were unqualified because, in many instances, they had not previously performed the 15 DISE procedures required for certification, a condition for Medicare to reimburse an HNS procedure.

35. Inspire was well aware of the requirement that all otolaryngologists had to perform 15 DISE procedures to be able to be certified to perform HNS procedures.

36. Shortly after starting at Inspire, in late 2022 or early 2023, Relator attended a new hire training led by Mike Kremkau, then the Area Director for Inspire's South Region. The training covered what a DISE procedure is, the anatomy behind both a DISE procedure and obstructive sleep apnea in general, and plainly stated "Medicare Certification Requirement: You must upload 15 videos for review to be reimbursed for Medicare implants."

37. The same training directed Inspire's sales representatives to upload videos of the DISE procedures to the "Inspire Airway Exam Review Website." It was via this website that Inspire employees, including Brian Brown and Heidi Nuorala, both Senior Clinical Trainers at Inspire, evaluated for CCC to fulfill the Medicare requirement that a "manufacturer's second opinion service of validation

13

via video clip submissions of at least 80% agreement in at least 15 consecutive studies."

38. Inspire's training for providers, not just its own employees, also highlighted the requirement. In a company document titled "Product and Therapy Training for Providers," which had the purpose of "defin[ing] the minimum training required for Providers associated with airway examinations, device implants, system programming and the patient care pathway to provide safe and effective therapy," the company noted that "[c]urrent Medicare policy requires that implanting surgeons be certified by Inspire, by requiring successful completion of 15 consecutive airway exams via DISE video submission with at least 80% agreement by trained Inspire personnel. Inspire must generate a certificate for each implanting surgeon once this criteria [*sic*] has been met."

39. Despite knowledge of the Medicare reimbursement policy, Inspire did not follow it. Instead, the company had a culture of meeting quotas at any cost, and sales representatives, including Relator, were urged to do whatever it takes to get more physicians "certified" in DISE procedures as quickly as possible to be able to sell them the company's devices.

40. This was achieved by copying and pasting videos between otolaryngologist folders within Inspire's Airway Exam Database (or "IAE"). The IAE Database was organized by otolaryngologist, with each having a folder in

14

which their 15 DISE videos were stored, available for review by Inspire employees such as Brown or Nuorala. Within the IAE database, Inspire sales representatives could simply copy videos from one otolaryngologist's folder and paste them in another's, double counting the video as having been performed by each.

41. Relator suspected this avenue of fraud from his first days at Inspire. During the training described above, which explained Medicare's requirement for DISE experience, he inquired about whether other information, besides merely a video, should be logged anywhere within Inspire's system. He specifically asked if any patient identifying information or date of service should be recorded and logged as a safeguard against inaccuracies and fraud. The Inspire training staff indicated that those extra data points were not necessary and just the video was enough.

42. Relator's direct supervisor and Inspire Regional Sales Manager, Shelley Rabbitt, was more explicit.

43. In the Fall of 2023, Relator was seeking to sell Inspire devices to an otolaryngologist in the San Diego area. That otolaryngologist only had three DISE videos in their IAE database folder, 12 short of the requirement.

44. Relator and Rabbitt discussed what to do to try to close these sales and help meet Relator's sales quota. Rabbitt, in a series of conversations, told Relator that if she were in his shoes, she would have a bank of DISE videos that she could place in any provider's folder in the database. When Relator asked Rabbitt where

15

he would get additional DISE videos, she encouraged him to contact other sales representatives to get their DISE videos and to film all DISE procedures he was aware of, even when the performing physician had performed over 15 prior DISE procedures and was already certified, all to build his reserve of videos.

45. Relator understood that the company's sales focus was to hit ever-expanding quotas, and waiting for each potential otolaryngologist to hit 15 DISE procedures, which realistically could take an otolaryngologist with no DISE experience six months to a year, stood in the way of that.

46. In response to Rabbitt's advice, Relator actually ended up copying 10 videos from other physician folders into the folder for the San Diego area otolaryngologist. Inspire approved all 10 without question, leaving the physician two videos away from certification. Relator, not wanting to authorize an unqualified physician to perform DISE and HNS procedures, did not upload the two additional videos to the folder, so the San Diego physician was not certified by Inspire during Relator's time at the company. Relator was fired shortly after, for not meeting quotas.

47. Relator understood Inspire's goal in the scheme was to allow as many otolaryngologists as possible to purchase, install, and bill for its devices, regardless of their true qualifications.

16

48. Relator has spoken with several other sales representatives at Inspire, including another former territory manager for Inspire in Orange County who had been with the company since May 2021. All confirmed that sales managers routinely advised sales personnel to copy DISE videos from other providers and thus count them multiple times.

49. If Medicare was aware of Inspire's fraud, it would not have paid for HNS procedures that were performed by falsely certified physicians.

## COUNT I

### Violations of 31 U.S.C. § 3729(a)(1)(A), (B), (G)

### Federal False Claims Act

50. Relator alleges and incorporates by reference the allegations made in Paragraphs 1 through 49 of this Complaint.

51. This is a claim for treble damages and penalties under the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

52. By virtue of the acts described above, Defendant, its agents, and employees knowingly have presented, or caused to be presented, false or fraudulent claims for payment to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A). Each of these requests for payment constitutes an actionable false claim under the False Claims Act.

17

53. By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements to get the United States to pay or approve false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

54. By virtue of the acts described above, Defendant, its agents, and employees knowingly have made or used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).

55. The United States, unaware of the falsity of the records, statements, or claims that Defendant made or caused to be made, paid, and continues to pay, the claims that would not be paid but for Defendant's illegal conduct.

56. By reason of these payments, Defendant have damaged, and continue to damage, the United States a substantial amount to be determined at trial. In addition, the United States is entitled to penalties for each and every false or fraudulent claim made or caused to be made by Defendant.

### PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendant as follows:

1. That Defendant ceases and desists from violating 31 U.S.C. §§ 3729 *et seq.*;

18

2.    That the Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's actions, as well as civil penalties against Defendant for each violation of 31 U.S.C. §§ 3729 *et seq.*;

3.    That Relator be awarded all costs and expenses of this action, including attorneys' fees, litigation expenses, and post-judgment interest;

4.    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d); and

5.    That the United States and Relator receive all such other relief as the court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator hereby respectfully demands trial by jury on all issues and counts triable as of right before a jury.

19

Dated: November 19, 2024

Respectfully submitted,

Eric Havian
WHISTLEBLOWER PARTNERS LLP
4 Embarcadero Ctr, Suite 400
San Francisco, CA 94111
Tel: (415) 707-6855
Eric@whistleblower.law

Reece Roman
REECE ROMAN LAW, PC
5857 Owens Avenue, #300
Carlsbad, CA 92008
Tel: (760) 445-2465
Reece@reeceromanlaw.com

*Attorneys for Relator Patrick Collins*